IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LINDA PETTWAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 2:03-CV-00909-B |
| | ) | WO |
| ALABAMA DEPARTMENT OF | ) | |
| PUBLIC HEALTH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER ON MOTION

Linda Pettway ("Pettway"), an African-American currently employed by the Alabama Department of Public Health ("the Department"),  seeks damages for job discrimination claims grounded on race, disability, and retaliation.  Sued along with the Department are four supervisory employees, in individual and official capacities:  *Lisa Pezent* ("Pezent"), Complaint Unit Supervisor of the Division of Health Care Facilities in the Bureau of Health Provider Standards ("the Bureau");  *Elva Goldman* ("Goldman"), Licensure and Certification State Program Director;  *Bill Godwin* ("Godwin"), Deputy Director of the Bureau;  and *Rick Harris* ("Harris"), Director of the Bureau. After considered scrutiny of the pleadings,  evidence,  briefs,  and  relevant  law, the court concludes, as herein explained, that only Pettway's disparate discipline claim of race discrimination against the Department survives *Defendants' Motion for Summary Judgment* (Doc. 39, July 7, 2004).

## I.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.

P. 56(c).  The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of "the pleadings and evidentiary record" which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) (discussing burden-shifting under Rule 56).

In response to a properly supported motion for summary judgment, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits, or as otherwise provided .... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  As the Supreme Court instructed in *Celotex,* 477 U. S. at 323,  "the plain language of Rule 56(c) mandates the entry of summary judgment . . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

The court's role is neither to weigh the evidence nor to find the facts; instead, it is "the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 250 (1986).  Substantive law  identifies those facts which are material.  *Id.* at 258.  The court is bound to accept the evidence of the non-moving party as true, resolve all doubts against the moving party, construe all  evidence in the light most favorable to the non-moving party,  and draw all reasonable inferences in the non-moving party's favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson,*  477 U. S. at 255.    If more than one reasonable

inference can be drawn, and that inference creates a genuine issue of material fact, summary judgment is not warranted because the trier of fact is entitled to decide which inference to believe. *See Hunt v. Cromartie,* 526 U.S. 541, 550-55 (1999)*; Patterson & Wilder Const. Co., Inc. v. U.S.,* 226 F.3d 1269, 1273 (11th Cir. 2000).

## II.   Undisputed Facts [1]

In March 2000,  Pettway started work in the Bureau in the classification now known as Licensure & Certification Surveyor ("L&C Surveyor").  Following  assignments in several units within the Bureau's Division of Health Care Facilities ("the Division"),  in July 2001 she settled in the Complaint Unit to conduct investigative surveys of nursing home facilities initially in response to complaints and thereafter to assess the facility's correction of identified problems.   Defendant Pezent, Division Director, acted as Pettway's immediate supervisor, while Defendant Goldman served as immediate supervisor for  Pezent.

While assigned to the Complaint Unit,  Pettway suffered a series of personally traumatic events within a period of nine months: her father's unexpected death, her daughter's military deployment to Afghanistan,  her own gynecological  surgery for cancer on January 15, 2002, and her sister's suicide five days later.  Approved sick leave extended her post-surgery return from the scheduled date of  February 27, 2002, and she received another extension until March 13, 2002, following complications during her surgery and subsequent hospitalization for emotional problems.

---

[1]These background facts are grounded on the evidentiary record viewed most favorably to the non-movant plaintiff, who submitted a "statement of undisputed facts taken directly from Defendants' Brief" with minor modifications as well as "pertinent facts not addressed in Defendant's Statement of Facts." (*See Pl.'s Response to Def.'s Motion for Summary Judgment*, hereinafter *Pl.'s Br.* at 1, 10-14).

From March 13 until March 29, 2002,  Pettway worked half-days intermittently on  desk reviews.  After she "passed out" in an anxiety attack at her desk on March 29, she was hospitalized before being re-admitted to a mental health facility.  She received additional medical leave requested until May 10, but pursuant to her treating physician's recommendation,  remained on medical leave until July 15,[2] although she desired to return sooner.[3]

On August 7, 2002,  Pettway received an assignment to conduct a follow-up survey at Montgomery's Capital Hill Healthcare Center ("CHHC") because a prior survey by another L& C Surveyor resulted in deficiency findings which included a "jeopardy level" indicative of a serious threat.   A day's end telephone inquiry by Defendant Pezent to this nursing home disclosed that Pettway had placed the facility "back in compliance" after arriving at 8:30 a.m. and leaving between 11:00 a.m. and noon.   Pettway's survey packet submitted two days later  indicated, however, a workday of 9.25 hours at CHHC , and it raised other discrepancies which prompted an investigatory conference on August 16 involving Pettway, Pezent, and Deputy Director Godwin.

Further investigation of the  CHHC survey resulted in an October 18, 2002,  notice to Pettway specifying proposed disciplinary action for her alleged falsification of record, solicitation

---

[2]For her extended leave between January and  July 15, 2002, Pettway  used a combination of compensatory leave, holiday leave, annual leave, leave  without pay,  accumulated sick leave, advanced sick leave, and donated sick leave from both co-employees and  Defendants Pezent and Harris.

[3]Pettway met with supervisors in June or July about her desire and  need to return to work in a less stressful job not requiring  overnight travel.  She acknowledged her doctor's contrary recommendation due to her mental state and medication side effects which  included drowsiness, disorientation, memory lapse, and confusion.   The parties dispute whether the Department wrongfully failed to accommodate her requests, and the court discusses the disputed facts in the context of the disability claim premised on these requested accommodations.

of false information from nursing home staff, unprofessional conduct, and failure to perform her job as a L&C Surveyor.   Pettway waived her right as a  merit system employee to challenge these charges in a scheduled due process hearing and instead accepted the recommended discipline: suspension  without pay from October 28, 2002 through November 1, 2002,  and effective with her November 4, 2002 return to work, a  demotion and transfer – without any corresponding decrease in salary – to Staff Nurse in the Worksite Wellness Division.

Pettway originated this action on August 29, 2003, and filed an Amended Complaint on February 10, 2004, to correct clerical errors and factual omissions.(*Mot. to Amend*, Doc. 17, Jan. 26, 2004).  Asserted discrimination claims are grounded jurisdictionally on the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; 42 U.S.C. §1983 ("Section 1983"); 42 U.S.C. §1981 ("Section 1981");   Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et. seq. ("Title VII");  the American with Disabilities Act of 1990, 42 U.S.C. §12101 et. seq ("ADA");  and the Rehabilitation Act of 1973,  29 U.S.C. 794 et seq. ("Rehab Act"). Jurisdiction and venue are not contested.

### III.  DISCUSSION

###   A.    INDIVIDUAL DEFENDANTS

All the individual defendants, indisputably  state actors, are entitled to summary judgment on all claims against them in individual and official capacities.   Pettway does not dispute that Section 1981 is an inappropriate jurisdictional vehicle for asserted claims.[4] Nor does she challenge

---

[4]The Eleventh Circuit follows the rule in *Jett v. Dallas Independent School District*, 491 U.S. 701, 733 (1989) that "the express cause of action for damages created by Section 1983 constitutes (continued...)

5

the impropriety of designating these individuals as defendants on her Title VII race discrimination claim[5] and the disability and retaliation claims which are premised on the ADA and the Rehab Act.[6]

In their official capacities, the individual defendants share with the Department immunity from Section 1983 liability.[7] For individual liability against these defendants under Section 1983, Pettway contends that, "acting under color of law, [they] deprived [her] of rights, privileges and immunities secured by the U.S. Constitution, which includes but is not limited to violations of the Equal Protection Clause, when [they] intentionally discriminated against [her] on the basis of race

---

[4](...continued)
the exclusive federal remedy for violation of the rights guaranteed in Section 1981 by state governmental units." *See Butts v. County of Volusia*, 222 F.3d 891, 893-894 (11th Cir. 2000) (concluding that the Civil Rights Act of 1991 did not amend Section 1981 to create a cause of action against state actors and "§ 1983 contains the sole cause of action against state actors for violations of § 1981. . . .; § 1981(c) makes clear that the section creates a right that private or state actors may violate but does not itself create a remedy for that violation."); *Godby v. Montgomery County Board of Education*, 996 F.Supp. 1390, 1411 (M.D. Ala. 1998).

[5]*See Busby v. City of Orlando*, 931 F. 2d 764, 772 (11th Cir. 1991)("The relief granted under Title VII is against the employer, not the individual employees whose action would constitute a violation of the Act.").

[6]The ADA provides only for liability of the employer and not individual employees. *Mason v. Stallings*, 82 F. 3d 1007, 1009 (11th Cir. 1996)(reasoning that since the definition of "employer" under the ADA is like the definition of "employer" under Title VII and the ADEA, then no such liability should exist under the ADA). Likewise, the Rehab Act does not provide relief against individual defendants. *Pritchard v. Southern Co. Servs.*, 102 F. 3d 1118, 1119 (11th Cir. 1996).

[7]Neither a state nor a state official acting in his or her official capacity is a "person" for the purposes of a Section 1983 action. *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989). "Official-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' " *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), *quoting Monell v. New York City Dep't. of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978).

regarding accommodations, promotions, and discipline."[8]

A claim cognizable under the Equal Protection Clause requires the plaintiff to allege her similarly situated status with others treated differently based on race or another constitutionally protected status. *Jones v. Ray*, 279 F.3d 944, 947 (11th Cir. 2001).  Discriminatory intent or purpose must be proven to establish an Equal Protection claim:

> Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decision maker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.

*Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (footnote and citation omitted); *see also Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265-266 (1979).

Pettway's equal protection claim against the individual defendants rests on the same material facts specified for her Title VII claims.  As discussed *infra*, she fails even to state an adverse employment action on two of her racial discrimination claims and affirmatively declines to attribute any racial animus to another claim; thus, on these claims, she cannot establish any constitutional right violated.  With respect to the final claim of disparate discipline, Pettway does not document any act or omission by the individual defendants from which the requisite intent can be inferred.  Consequently,  absent either direct evidence of discrimination or disputed issues of material fact on circumstantial evidence, the  individual defendants are entitled to summary judgment on the Section

---

[8]*Am. Compl.* ¶ 34.  In *Count One* at ¶¶ 31-33,  Pettway appears to state a Section 1983  cause of action against the individual defendants for "intentional race discrimination" grounded on the identical claims asserted for Title VII liability against the  Department.  As these Title VII claims are barred against the individual defendants, the court confines this Section 1983 analysis to the asserted constitutional violation of  equal protection.

1983 claim premised on the Fourteenth Amendment.[9]

## B.    TITLE VII RACE DISCRIMINATION CLAIMS[10]

### 1.   Overview of Claims

Pettway asserts racially disparate treatment claims that the Department "failed to make accommodations for [her] that were made for similarly situated white employees (¶ 31), . . .hired a less qualified white applicant for the position of Assistant MDS coordinator (¶ 32), . . .[and] suspended and demoted her." (¶ 33).   The Department moves for summary judgment because Pettway "cannot establish a *prima facie* case of race discrimination" and, alternatively, because "all actions taken with respect to [her] employment were taken for legitimate business reasons not shown by Pettway to be a pretext for unlawful discrimination."

In response to Pettway's accommodations and hiring claims, the Department denies that she "suffered an adverse employment action or that a suitable comparator was treated more favorably"; the Department responds similarly to the allegation that "Lisa Pezent and Elva Godwin, Plaintiff's

---

[9]This summary judgment  in favor of the individual defendants makes unnecessary any analysis of their qualified immunity defense on individual-capacity claims arising from performance of discretionary functions.  "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S.800,818 (1982); *Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994) (*en banc*).  *See Wilson v. Layne*, 526 U.S.603, 609 (1999) ([C]ourt "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.");  *see also  Killian v. Holt,* 166 F.3d 1156 (11th  Cir.1999) (affirming  entry of summary judgment without qualified immunity analysis because plaintiff "failed to bring forth evidence from which reasonable jurors could find that defendant prison officials knew of and were deliberately indifferent to a substantial risk of serious harm").

[10]The analysis is identical for claims based on the same facts but asserted under both Title VII and Section 1983.  *See Butts v. County of Volusia*, 222 F.3d 891, 893-94 (11th Cir. 2000);  *Abel v. Dubberly*, 210 F.3d 1334, 1338 (11th Cir. 2000); *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995)

superiors, stopped employees from donating Plaintiff their unused sick time." (¶ 19). Concerning Pettway's suspension and demotion, the Department maintains that she "has failed to demonstrate that a suitable comparator was treated more favorably or that she suffered from a differential application of workplace disciplinary rules."[11]   Discussion on each of these four claims follows a general  outline of the applicable analytical framework.

### 2.   *Analytical framework: disparate treatment claims*

Title VII makes it an "unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A.  § 2000e-2(a).   On a claim of disparate or discriminatory  treatment, as alleged by Pettway, the employee may offer direct or circumstantial evidence, and the latter is evaluated pursuant to the familiar burden-shifting analysis framed by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and summarized cogently by United States District Judge Myron H. Thompson in a "well-reasoned memorandum opinion" so characterized when affirmed on appeal:

> [A]n employee has the initial burden of establishing a *prima facie* case of unlawful discrimination by a preponderance of evidence. A "*prima facie* case requires 'evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion.'" ... If the employee establishes a prima facie case, the burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer discriminated against the employee.  This may be done by the employer articulating a legitimate, non-discriminatory reason for the employment decision, which is clear,

---

[11]Defendants' *Memorandum In Support Of Defendants' Motion For Summary Judgment*  at 2-3, n. 2 ("*Defs.' Br.*"); *Am. Compl.* ¶¶ 19, 31-33.

reasonably specific, and worthy of credence. The employer has a burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced...Once the employer satisfies this burden of production, the employee then has the burden of persuading the court that the proffered reason for the employment decision is a pretext for discrimination. The employee may satisfy this burden either directly, by persuading the court that a discriminatory reason more than likely motivated the employer, or indirectly, by persuading the court that the proffered reason for the employment decision is not worthy of belief. By so persuading the court, the employee satisfies his ultimate burden of demonstrating by a preponderance of the evidence that he has been the victim of unlawful discrimination.

*Hall v. Ala. Assn. of School Bds.*, 326 F.3d 1157, 1166 (11th Cir. 2003) (internal citations omitted)

Because Pettway does not rely on direct evidence,[12] her *prima facie* case must establish that (1) she belongs to a racial minority; (2) she was subjected to adverse job action; (3) her employer treated similarly situated employees outside her racial classification more favorably; and (4) she was qualified for the job. Pettway's task " is not onerous; it requires only that [she] establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 114 F.3d 1555, 1561-1562 (11th Cir. 1997). The ultimate issue in a race discrimination claim is whether the defendant intentionally discriminated against the plaintiff. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993); *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715 (1983). The *McDonnell Douglas* analysis provides an invaluable method of "progressively ... sharpen[ing] the inquiry into the elusive factual question of intentional discrimination." *Hall*, 326

_____

[12]Direct evidence of discrimination is evidence that "if believed, proves [the] existence of [a] fact in issue without inference or presumption.. . . [i]f an alleged statement at best merely suggests a discriminatory motive, then it is by definition only circumstantial evidence." *Burrell v. Board of Trustees of Ga. Military College,* 125 F.3d 1390, 1393 (11th Cir. 1997) (citations omitted). As an Eleventh Circuit panel noted in *Schoenfield v. Babbitt*, 168 F.3d 1257, 1267 (11th Cir. 1999): "As our precedent illustrates, direct evidence is composed of "only the most blatant remarks, whose intent could be nothing other than to discriminate" on the basis of some impermissible factor." (citations omitted).

F.3d at 1167 (*Mem. Op.*, Thompson, J.), *quoting Burdine*, 450 U.S. at 255, n.8.

### 3. *"Failure to Accommodate" Title VII Claim*

Pettway cites the following facts as support for her Title VII claim that the Department "committed intentional race discrimination . . . when it failed to make accommodations for [her] that were made for similarly situated white employees:

> Plaintiff's Doctor advised Defendant to accommodate Plaintiff's disability.  Specifically, Plaintiff's Doctor advised that Plaintiff's duties not involve overnight travel and that she be assigned only those work activities that produced relatively low levels of stress.  Pursuant to Doctor's advice, Plaintiff requested a temporary transfer to a less stressful position that did not require overnight travel.  Mrs. Goldman and Mrs. Pezent refused to make any accommodations for Plaintiff.  However, they made similar accommodations for similarly situated white employees.  Plaintiff alleges that she was denied accommodations because of her race.[13]

Careful scrutiny of the relevant admissible evidence yields compelling support for the Department's contention that its challenged failure to remove "overnight travel" from Pettway's job duties  does not constitute an  "adverse employment action."  Notwithstanding her burden to establish this element for her prima facie case,  Pettway fails altogether to address this contention   Neither her deposition  testimony nor any other evidentiary exhibit demonstrates how the asserted failure to accommodate effected a modification in duties or other conditions of her employment sufficiently to be deemed an adverse job action.

Whether an employee has suffered an adverse employment action is generally a question for

---

[13]*Am.Compl.* ¶¶ 20-22, 31; *see Pl.'s Br.* at 27-28; *Defs.'Ex.A*, Pettway *Dep.* at 210-213. Pettway maintains that  (a) both her requested accommodation and an allegedly similar request by a white employee, Melody Tompkins, "stemmed from emotional issues deriving from personal situations"; and (b) the Department granted in 1999 an ADA accommodation restricting travel for another similarly situated white employee. *Pl.'s Br.* at 27-29, Pl's *Ex. G.*

case-by-case consideration. *Gupta v. Florida Bd. of Regents*, 212 F. 3d 571, 586 (11th Cir. 2000).

Unmistakably clear from *Davis v. Town Lake Park, Fla.*, 245 F. 3d 1232, 1238-1239 (11th Cir. 2001)

is the Eleventh Circuit's view that "not all conduct by an employer negatively affecting an

employee constitutes adverse employment action:

> . . . to support a claim under Title VII's anti-discrimination clause the employer's action
> must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and
> demonstrable way. Although the statute does not require proof of direct economic
> consequences in all cases, the asserted impact cannot be speculative and must at least have
> a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove
> adverse employment action in a case under Title VII's anti-discrimination clause, an
> employee must show a *serious and material* change in the terms, conditions, or privileges
> of employment. Moreover, the employee's subjective view of the significance and adversity
> of the employer's action is not controlling; the employment action must be materially
> adverse as viewed by a reasonable person in the circumstances."

*See also Smith v. Alabama Dept. of Public Safety*, 64 F. Supp. 2d 1215, 1221(M.D. Ala. 1999).

The court finds no reported Eleventh Circuit holding that a failure to accommodate a

disability constitutes an adverse employment action.[14] Logic sanctions the availability of Title VII

to a protected plaintiff who demonstrates that an employer reasonably accommodated disabilities

shown by employees not within a protected class but failed - motivated by a racially discriminatory

intent – to make similar reasonable accommodations for the similarly situated plaintiff's disability.

---

[14]The district court in *Crumpton v. St. Vincent's Hospital*, 963 F. Supp. 1104, 1115 n.8 (N.D. Ala. 1997) expressed doubt about the viability of a disparate treatment claim based on accommodations for a disability. In *Phillip v. Ford Motor Corp.*, 328 F. 3d 1020 (8th Cir. 2003), the only published circuit opinion, the Eighth Circuit affirmed the grant of summary judgment on a race discrimination claim for failure to accommodate because the plaintiff was not "disabled" under the ADA so as to trigger the employer's duty to accommodate. Without resolving whether the plaintiff must be "disabled" as defined by the ADA, the district court for the District of Columbia Circuit has acknowledged Title VII claims based on failures to accommodate a disability. See *Richard v. Bell Atlantic Corp.*, 209 F. Supp. 2d 23 (D.D.C. 2002) and *Dorchy v. Washington Metro. Area Transit Authority*, 45 F. Supp. 2d 5 (D.D.C. 1999).

12

Pettway makes no such showing on this record; indeed, as explained *infra*, she cannot establish her own statutory disability for any evaluation of comparators.  Nor does she assert the Department's racially discriminatory accommodation of requests by non-disabled employees outside the protected class while refusing to accord her the same "privileges" of employment by granting her similar requests for accommodation.

Pettway proffers no evidence that the Department's refusal to grant her requested accommodations for returning to work resulted in her loss of pay, benefits, or other economic injury; instead, it is undisputed that once released for a return to work without restrictions, Pettway resumed her former position as an L&C Surveyor and sometime in February 2003, applied successfully for a nurse coordinator's position.[15]   Without evidence to support a finding that a reasonable person would view the Department's specified failure to accommodate as effecting a serious and material change in the terms, conditions, or privileges of her employment,  Pettway cannot carry her burden to establish a prima facie case of discrimination.  Summary judgment for the Department is thus appropriate. *See Turlington v. Atlanta Gas Light Co.*, 135 F. 3d 1428, 1432 (11th Cir. 1998)("Although a plaintiff's burden in proving a prima facie case is light, summary judgment against the plaintiff is appropriate if he fails to satisfy any one of the elements of a prima facie case.")(citations omitted).

Even if Pettway's showing established an actionable adverse employment action, her Title VII failure to accommodate claim would still fail on her inability to demonstrate the Department's disparate preferential treatment of similarly situated white employees.  Proffered evidence does not

---

[15] Pettway *Dep*. at 165-166 and *Ex. 21*.

establish the only comparator identified, Melody Tompkins, as a similarly situated  employee.[16]

Although no race is supplied for an unnamed employee referenced as a comparator in *Plaintiff's Ex.*

G, it is not disputed that the employee  is outside of Pettway's race;  nonetheless,  Pettway similarly

fails to document a similarly situated status.[17]   Moreover,  even if the court deemed  Pettway's

"adverse action" and "similarly situated  showing" sufficient for a prima facie case of racial

discrimination, this record establishes her inability to rebut the Department's non-discriminatory

reason for failing to make the accommodation requested.[18]

 

    **4.**       ***Claim from Hiring of Assistant MDS Coordinator***

---

[16]Petttway testified that she was "not sure Melody's was medical." Pettway *Dep.* at 48. Tompkins herself declares  that she never suffered from a medical condition that resulted in an inability to travel  overnight  or that she requested  an accommodation,  including an ADA accommodation. Tompkins *Aff.* ¶¶ 7-8.

[17]There is no evidence that this unnamed employee had the same "no overnight travel" restrictions as Pettway.  According to  *Ex.G,* the employee was "unable to drive"  but  "able to perform the essential functions" of her job, and the Department provided an accommodation by modifying work assignments temporarily.   The fact that an employer  has offered  a certain accommodation to one employee does not mean, however,  that the same accommodation must be extended to a plaintiff as a matter of law.  *Crumpton v. St. Vincent's Hospital*, 963 F. Supp. 1104, 1115 (N.D. Ala. 1997) (citations omitted).

[18]Pettway requested placement at the intake desk, a transfer to the Assistant MDS position, or an assignment to perform desk audits. By June or July of 2002, when Pettway sought a return to work with such accommodation, the Department  no longer  needed to man the intake desk since the designated employee had returned to work, and it had  no vacant desk audit jobs  (*see Def.'s Ex. B*, Pezent *Aff.*  ¶¶12, 13 and14). The Department filled the Assistant MDS vacancy through the open-competitive process, as discussed *infra* in the context of Pettway's separate Title VII claim arising therefrom.  Moreover, as the principal non-discriminatory, legitimate  reason for not making the accommodation requested, the Department established  overnight travel as an essential function of Pettway's  job. *See Def.'s Ex. C,* Godwin *Aff.* and  *Ex. 1* attachment.

In response to Pettway's claim that the Department hired a less qualified white applicant for the position of Assistant MDS Coordinator, the Department denies that its action constituted an employment action adverse to Pettway "because the position at issue was a purely lateral transfer that did not effect a serious and material change in the terms, conditions, or privileges of employment."[19] Notwithstanding the complaint's reference to the position as a promotion, Pettway admits in deposition testimony, as does her counsel in brief, that it did represent only a transfer for her.[20]

To prove this disparate treatment claim, Pettway must show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) someone outside of the protected class was hired into the position. *Hinson v. Clinch Co., Ga. Bd. of Educ.*, 231 F. 3d 821, 828 (11th Cir. 2000).  Conceding that Pettway satisfies the first, second, and fourth requirements, the Department argues its entitlement to summary judgment for lack of proof that Pettway suffered any adverse employment action resulting from the transfer:

> The Plaintiff admits that the Assistant position would not have been a promotion for the Plaintiff, but a transfer, with no increase in pay or change in job title or classification. (Exhibit A - Deposition of Plaintiff, page 65, line 15, to page 66, line 1.). . . [T]he Plaintiff cannot provide any evidence that shows any "serious and material" differences in the position of L&C Surveyor assigned to work in the Complaint Unit and an L & C Surveyor assigned to work as the Assistant in the Health Care Assessment Unit. *See Smith*, 145 F.Supp.2d at 1299.  The coordinator retains the same classification of L&C Surveyor (Exhibit J - Affidavit of Tompkins, pages 1-2, paragraph 3).   A salary increase would not occur by transferring to the coordinator position. (Exhibit A - Deposition of Plaintiff, page 65, line 15, to page 66, line 1.)  Ms. Tompkins continues to travel, including overnight travel, as a part of her job duties as the coordinator to instruct and train health care providers in the field. (Exhibit J. page 2, paragraph 4).[21]

---

[19]*Defs.' Br.* at 36, citing *Davis v. Town Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001).

[20]*See Am. Compl.* ¶ 34;  Pettway *Dep.* at 65-70; *Pl.'s Br.* at 25, 29.

[21]*Defs.' Br.* at 38-39.

Because Pettway again fails to respond specifically to the Department's legal contention, the court has examined the evidence for any disputed issue of material fact which is relevant. The undisputed fact that the transfer would not have increased Pettway's pay or benefits prompts an alternative showing that it would have heightened her job prestige or responsibility sufficiently to trigger a *serious and material* change in the terms, conditions, or privileges of her employment. *See Davis,* 245 F. 3d 1239; *Doe v. Dekalb County Sch.Dist.*, 145 F.3d 1441, 1448-1449 (11th Cir. 1998); *Smith v. Ala. Dep't of Corrections*, 145 F. Supp. 2d 1291, 1297-1298 (M.D. Ala. 2001); *Rowlin v. Ala. Dep't of Pub. Safety*, No. 00-D-580-N, 2001 WL 630581 (M.D. Ala. May 22, 2001). The court is unable to discern any material dispute underlying this necessary component of Pettway's prima facie case.[22]   Summary judgment is thus dictated for the Department.[23]

---

[22]Rather than viewing the transfer as an opportunity for more prestige or advancement, Pettway acknowledged that concerns for her health fueled her interest: "No, it would not have been a promotion. It would have actually been a position that would have helped me. The reason why I applied for it was my accommodations that my physician said that I needed in order to get well. . . I had not been medically released from Dr. Awtrey's care." (Pettway *Dep.* at 65-66)

[23]Assuming *arguendo* that Pettway has demonstrated an adverse employment action, further analysis of her "pretext" rebuttal to the Department's proffered reason for its selection decision reveals no disputed issue of material fact which precludes summary judgment. The Department documents the superior qualifications and first-place ranking of Melody Tompkins among the interviewed applicants as well as Pettway's pending investigation for workplace misconduct. S*ee Defs.' Br.* at 47-49; *Defs.' Ex. L*, Furlow *Aff.* ¶¶ 7-8; *Defs.' Ex. K*, Sadler *Aff.* ¶ 11. Pettway cites her greater seniority and experience in teaching, training, and supervising health professionals while attacking as "premature and prejudicial" the consideration of misconduct charges not yet brought and adjudicated against her. S*ee Pl.'s Br.* at 29-32; *Pl.'s Exs.W* at 31, *T,* and *C* at 27. After considering all pertinent evidence, including the testimony cited as support for Pettway's characterization of the whole interview process as a pretext, the court does not find a genuine issue of disputed fact for a race-based animus tainting the selection process or for a showing that Pettway was "substantially more qualified" than Tompkins. *See Lee v. GTE Florida,* Inc., 226 F. 3d 1249, 1253 (11th Cir. 2000) (holding that disparities in qualifications are not alone enough to demonstrate discriminatory intent; ... disparities must be "so apparent as virtually to jump off the page and slap you in the face."); *Hall v. Alabama Ass'n of School Bds.,* 326 F. 3d at 1167-68*; Cofield v. Goldkist,*

(continued...)

### 5.   Claim relating to *"sick leave"*

Pettway's allegations regarding the Department's termination of sick leave donated by co-employees are not specified as the basis for any kind of actionable discrimination, but her apparent intent to claim racial discrimination is clarified [24] and discussed as a distinct Title VII claim.  The claim requires no judicial analysis, however, because Pettway could not attribute to the Department any racial animus,[25]  has not shown and cannot show on this record either the actual occurrence alleged  – thereby negating any  adverse employment action  – or the Department's more favorable

---

[23](...continued)
*Inc.*, 267 F. 3d 1264, 1268 (11th Cir. 2001);   *Thomas  v. Troy City Bd. of Educ.*, 302 F. Supp. 2d 1303, 1308 (M.D. Ala. 2004).

[24]*See Am. Compl.*  ¶19 ( "Plaintiff was forced to return to work on July 15, 2002 despite her Doctor's recommendation. Plaintiff's fellow employees, aware of the seriousness of Plaintiff's condition, donated Plaintiff sick leave.  Lisa Pezent and Elva Godwin, Plaintiff's supervisors, stopped employees from donating Plaintiff their unused sick time.") ;  *see also Pl.'s Br.*  at 28 ("Defendant furthered its discriminatory purpose by forcing the Plaintiff back to work.  That is, Defendant caused the recruitment of donated sick leave to cease.").

[25]*See* Pettway *Dep.* at 73-74:

> Q.   Do you believe that the donated leave was stopped because of your race?
>
> A.   The donated leave was stopped in order to force me to come back to work before the doctor was allowing me to come back to work–for my medical condition to allow me to come back to work.
>
> Q.   Is it your belief you were being forced to come back to work before your doctor released you because of your race?
>
> A.   I'm not going to really try to say what the overall behind that.  I just felt like during that time I got lots of calls from Lisa.  Sometimes people put time frames on illnesses that you really can't put time frames on.
>
> Q:   Can you identify a person outside your race for whom the defendants did not stop people from donating sick leave?
>
> A.   I wouldn't have no idea of knowing that?

.

17

treatment of donated sick leave to similarly situated white employees.[26]  Accordingly, the Department is entitled to summary judgment on this claim due to Pettway's inability to make a prima facie case.

### 6. *Disparate Discipline Claim*

Pettway's claim that the Department "suspended and demoted [her]based on race" rests on her allegation that "[w]hite surveyors guilty of various and similar employment violations were not suspended or demoted despite the Defendant's awareness of the misconduct."  She identifies Patty Boyd ("Boyd") and Wayne Cumbie ("Cumbie") as the similarly situated comparators treated more favorably because the Department suspended each without pay but did not demote them.[27]  The Department submits  that Pettway "has failed to demonstrate that a suitable comparator was treated more favorably or that she suffered from a differential application of workplace disciplinary rules"; alternatively, the Department maintains that Pettway cannot show that its asserted reason for her discipline amounts to a pretext for racial discrimination.[28]

After summarizing case law pertinent for the evaluation of this claim,  the court analyzes "the factual dispute [which centers] around whether or not similarly situated white employees were disciplined more favorably than was [Pettway]"[29], concluding that material issues of fact must be resolved by the jury.

### a. *Controlling Legal Standards*

---

[26]*See* Pettway *Dep.* at 74.

[27]*See Am. Compl*. ¶¶ 29,33; Pettway *Dep*. at 167-169; *Pl.'s Br.* at 26.

[28]*Defs.' Br*. at 3.

[29]*Pl.'s. Br*. at 26, ¶ 1.

The familiar standards for circumstantial evidence in Title VII discrimination cases govern Pettway's claim of racially discriminatory discipline.

> ...[A] plaintiff must first make out a prima facie case demonstrating: (1) that he belongs to a protected class under Title VII; (2)that he was qualified for the job; and (3) that a similarly situated employee engaged in the same or similar misconduct but did not receive similar discipline. *See Lathem v. Dep't of Children and Youth Servs.*, 172 F.3d 786, 792 (11th Cir. 1999); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). Once a plaintiff makes a prima facie showing, the burden of going forward shifts to the employer who must provide a specific legitimate non-discriminatory reason for disciplining the employees differently. *See [Texas Dep't of Community Affairs v.] Burdine*, 450 U.S. [248], [] 254-44, 101 S.Ct. 1089[(1981)]; *Lathem*, 172 F.3d at 793. Finally, the ultimate burden of persuasion rests with the plaintiff who must show that the proffered legitimate reasons for the different disciplinary actions were pretextual thereby permitting, but not compelling, the trier of fact to conclude that the employment action at issue was the product of illegal discrimination. *See Burdine*, 450 U.S. at 256, 101 S.Ct. 1089; *Lathem*, 172 F.3d at 793; *Combs [v. Plantation Patterns*, 106 F.3d 1519, [] 1529-38 [(11th Cir. 1997]

*Alexander v. Fulton County*, 207 F. 3d 1303, 1336 (11th Cir. 2000).

Because the court need not resolve any dispute on Pettway's status and qualifications, the evidentiary analysis necessarily focuses on the Department's disciplinary treatment of any *similarly situated employees who engaged in the same or similar misconduct.*. Notwithstanding the Department's view that "[t]he Eleventh Circuit has yet to articulate a definitive standard for analyzing comparable employees and their misconduct" (*Defs.' Br.* at 41), the court finds instructive then-Chief District Judge Albritton's assessment of Circuit precedent in an affirmed decision on point from this court,

> Under Eleventh Circuit precedent, if two employees are not similarly situated, then the different application of workplace rules does not constitute illegal discrimination. (*citing Lathem , supra*, 172 F.3d at 793). In order to determine whether employees are similarly situated for purposes of a prima facie case, a court must consider whether the employees are involved in the same or similar conduct and are treated in different ways. *See Silvera v. Orange County Sch.Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001). Moreover, the comparator's conduct must be nearly identical to the plaintiff's so that courts will not second-guess an employer's reasonable decisions. *Id.* *** In

19

evaluating whether employees are similarly situated within the context of a disparate discipline claim, the most important factors to be considered are "the nature of the offenses committed and the nature of the punishments imposed." (quoting *Silvera*, 244 F. 3d at 259)

*Gaddis v. Russell Corp.*, 242 F. Supp. 2d 1123, 1140 -1141 (M.D. Ala. 2003), *aff'd*, No. 03-10585, 2003 U.S. App. LEXIS 27845 (11th Cir., Nov. 28, 2003).

That the *Gaddis* court gleaned properly the "nearly identical" misconduct standard finds some confirmation in the Eleventh Circuit's discussion of the issue in a recent decision, albeit unpublished, also emanating from this court:

> "To show that employees are similarly situated, the plaintiff must know that the 'employees are similarly situated in all relevant respects.'" *Knight v. Baptist Hospital of Miami, Inc.*, 330 F. 3d 1313, 1316 (11th Cir. 2003) (quotation omitted). Indeed, "the comparator must be nearly identical to the plaintiff, 'to prevent courts from second-guessing a reasonable decision by the employer.'" *Wilson [v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)] (quoting *Silvera*, 244 F.3d. at 1259) [FN5]

> > FN5 In examining claims that employees were disciplined in a disparate manner, we have explained that "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." See *Maynard v. Bd. of Regents of Universities of Fla. Dep't of Educ.*, 342 F. 3d 1281,1289 [(11th Cir. 2003)] Different panels of this Court, however, have determined that this conduct requires "similar" conduct, see e.g.,*Jones v. Gerwens*, 874 F. 2d 1534, 1540 (11th Cir. 1989), as opposed to "nearly identical" conduct, *see, e.g., Maniccia v. Brown*, 171 F. 3d 1364, 1368-69 (11th Cir. 1998). *See Maynard*, 342 F.3d at 1290.

*Cooley v. Great Southern Wood Preserving*, No. 04-15912, 2005 U.S.App. LEXIS 8932, at*20 (11th Cir. May 18, 2005).[30]

---

[30]The *Cooley* court's evidentiary analysis is instructive: "Here, the only comparator the plaintiffs identified in their amended opposition to summary judgment was Oliveira, asserting that Great Southern did not terminate Oliveira's employment as quickly as it terminated [plaintiff]

(continued...)

Also informing this court's analysis is this guidance from the Supreme Court on assessing the comparability of misconduct by similarly situated employees:

> Of course, precise equivalence in culpability between employees is not the ultimate question: as we indicated in *McDonnell Douglas*, an allegation that other "employees involved in acts against [the employer] of *comparable seriousness*...were nevertheless retained..." is adequate to plead an inferential case that the employer's reliance on his discharged employee's misconduct as grounds for terminating him was merely a pretext.

*McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 283 n. 11 (1976) (emphasis in original)(quoting *McDonnell Douglas*, 411 U.S. at 804).[31]

Finally, the Eleventh Circuit affirmed recently this district court's grant of summary judgment for a demoted employee's failure to make a prima facie case of race discrimination by showing the employer's disparate disciplinary treatment to a similarly situated employee; the non-published opinion reaffirms the "nearly identical" standard to compare alleged misconduct:

The gravamen of the parties' dispute is whether a similarly situated white employee

---

[30](...continued)
Hackett's employment, based on the same misconduct. However, in determining that Oliveira was not similarly situated, the court properly considered the undisputed evidence that Hackett's employment was terminated because Great Southern believed that he twice failed to report within 48 hours a speeding ticket and that he had received two speeding tickets within 12 months. Oliveira, on the other hand, reported within 48 hours all of the speeding tickets that he received, and his termination was based solely on his involvement in accidents. Thus, whether we apply the "similar" or "nearly identical" analysis, Oliveira was not a proper comparator." *Id.* at*21 (citation omitted).

[31]In the *Jones v. Gerwens, 874 F.2d at 1541,n.12* opinion referenced in *Cooley*, supra, the Eleventh Circuit emphasized this guidance from the Supreme Court. *See also Holifield* , 115 F.3d at 1563 ("[Plaintiff] has failed to establish that the non-minority employees with whom he compares his treatment were similarly situated in all aspects, or that their conduct was of comparable seriousness to the conduct for which he was discharged.");  "Exact correlation [,however,] is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples." *Silvera,*  244 F. 3d at 1259 (quoting *Dartmouth Review v. Dartmouth College*, 889 F. 2d 13, 19 (1st Cir. 1989)).

was disciplined less severely than Moore. (footnote omitted). The district court held that Moore failed to produce evidence of a similarly situated employee, and we agree. We have held tht "the most important factors in the disciplinary context ... are the nature of the offenses committed and the nature of the punishment imposed." Silvera [ ], 244 F.3d at 1259 [ ]. "The comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id.* (internal quotation marks and citation omitted).

*Moore v. Alabama Dep't of Corrections*, No. 04-12956, 2005 U.S.App. LEXIS 12079,* 7-8 (11th Cir. June 21, 2005).[32] Of particular relevance for this court's analysis is the *Moore* court's reminder of how the Eleventh evaluates evidence of different titles and different supervisors for allegedly comparable employees.:

> The district court held that Sgt. Pierce's and Lt. Moore's different ranks and different supervisors served to distinguish the two. Our prior cases compel the conclusion that these factors are not alone dispositive of the issue. See *Anderson v. WPMG-42*, 253 F.3d 561, 565-66 (11th Cir. 2001) (different supervisors not dispositive); *Lathem v. Dep't of Children and Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) (different job titles not dispositive).

*Moore*, supra, *9-10.

Summary judgment is appropriate if the plaintiff fails to show the existence of a similarly situated employee, and no other evidence of discrimination is present. *Holifield,* 115 F.3d at 1562.

### b. Evidentiary Analysis - Disparate Discipline

---

[32]In an unpublished decision from the Northern District of Georgia, filed June 29, 2005, a third panel (Barkett, Hull and Wilson, Circuit Judges) joined the *Cooley* panel *(*Tjoflat, Dubina and Fay, Circuit Judges*)* and the *Moore* panel *(*Birch, Barkett and Kravitch, Circuit Judges)  in reaffirming the Eleventh Circuit's view that "[i]n order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Johnson v, Atlanta Independent School System*, No. 04-16131, 2005 U.S.App. LEXIS 13214 *5-6 (11th Cir. June 29, 2005) (quoting *Silvera*, 244 F.3d at 1259).

Undisputed are the alleged charges and the resulting discipline accepted by Pettway in lieu of a due process hearing. She was "suspended without pay for a period of five working days, transferred, and demoted to a Staff Nurse with the Worksite Wellness Division in the Bureau of Health Promotion and Information" for misconduct described as "falsification of records, solicitation of false information from nursing home staff, unprofessional conduct, and [ ] failure to perform [her] job properly as a Licensure and Certification Surveyor."[33] Pettway does not provide evidence either that she did not commit the infractions charged or that she did not acquiesce in the recommended punishment. Instead, she rests her disparate discipline claim solely on a contention that "... [two] white employees [L & C Surveyors Patty Boyd and Wayne Cumbie] were [not] demoted for their conduct which was under the circumstance more egregious than that alleged against [Pettway]." (*Pl.'s Br.* at 9).

Thus, the court now examines the evidence to determine if Boyd and Cumbie are proper comparators and, if so, whether they received more favorable treatment than Pettway for "nearly identical" misconduct. Pettway served her five-day suspension between October 28 and November 1, 2002, and returned to work in her demoted status on November 4.[34] Undisputed evidence discloses that Boyd served a five-day suspension without pay (06/02/03 - 06/06/03) for (1) falsification of records, (2) false information to supervisors, (3) hindering an investigation, (4)excessive mileage to

---

[33]See Pettway *Dep*, Defs.'Ex. 14 (Sept. 24, 2002 memorandum to Pettway from Defendant Pezent, providing chronology of relevant events between August 7 and 20, 2002, with notice of a recommended five-day suspension as discipline ); *Defs.' Ex. 17* (October 18, 2002 letter from State Health Officer Donald Williamson to Pettway, providing notice of and the basis for recommended disciplinary action, notice of Pettway's right as a merit system employee to a due process hearing, the scheduled date, time, and place for the hearing, as well as Pettway's option to "waive [her] right to such a hearing [and] accept the [discipline proposed]." Pettway *Dep*. at 148-149;

[34]*Defs.'Ex. 19*, Pettway *Dep*.

a State vehicle, and (5) violation of the Department's Professional Conduct Policy.  It is similarly acknowledged that Cumbie received a five-day suspension without pay ( 08/04/03  - 08/08/03) for (1) failure to follow supervisor's directive, (2) violation of the Department's Professional Conduct Policy, and (3) failure to perform job properly as an L&C Surveyor.[35]

The Department does not deny that these employees – all classified as L&C Surveyors – are proper comparators  but argues  that Pettway "is not similarly situated to Ms. Boyd and Mr. Cumbie because [she] engaged in misconduct that is not 'nearly identical' to their misconduct and thus she received a different punishment:

> While the Plaintiff was disciplined for her lack of professionalism, like Ms. Boyd and Mr. Cumbie, and for the falsification of records, like Ms. Boyd, there is no evidence to suggest that Ms. Boyd and Mr. Cumbie were guilty of the remaining misconduct in which the Plaintiff engaged: the solicitation of false information from a representative of a regulated facility and for an incomplete work assignment.  It was appropriate for the Plaintiff to receive different discipline because she violated different work rules. Thus, with the "nature of the offense[s] being different, the Plaintiff cannot be similarly situated to Ms. Boyd and Mr. Cumbie."[36]

Upon analysis, the court isolates disputed issues of fact which preclude concurrence with the Department's contention.[37]  With respect to the "solicitation of false information" charge against Pettway, the record establishes that Boyd's disciplinary charges included "false information to superiors."  Insufficient evidence is provided on this record, however, for any meaningful evaluation

---

[35]*Defs.' Ex. C,* Godwin *Aff.* ¶19. Defendant Godwin represents that he "participated in the investigation of and the decision to discipline both individuals." *Aff.* ¶18.

[36]*Defs. Br.* at 43.

[37]The Department's additional contention that Boyd and Cumbie "are not similarly situated to [Pettway} because different supervisors were involved in each disciplinary situation" is not dispositive.  *See Anderson* , 253 F.3d at 565-66 and *Lathem,* 172 F.3d at 793.  Moreover, the Department's submissions demonstrate that supervisory Defendants Godwin and Harris participated in either or both investigations and decisions to discipline Pettway, Boyd, and Cumbie.

of these offenses.  Though the Department refers to violations of different work rules, the applicable

rules are not provided for the court's evaluation.[38]

Defendant Godwin's description of Boyd's "false information to superiors" offense does not

reference any work rule thus violated.   Similarly, Defendant Pezent's memorandum detailing

Pettway's misconduct on her assignment to follow up on deficiencies cited at the Capital Hill Health

Care nursing home does not specify a work rule violated by the stated facts for the resulting charge

of  "solicitation of false information"

> I conducted a one on one interview with Hugh Davis on 8/20/02 at 4:00 p.m.  At which
> time, I again explained my position as your supervisor.  He voiced understanding of
> my questioning your visit.  Mr. Davis told me that on Friday, August 16, 2002 during
> the time that Bill Godwin and I were speaking with hom on the phone requesting that
> he put his statement in writing, that you had called the facility and spoke with his
> Director of Nursing and after that, called him and basically asked him to "fudge" your
> time in the facility and also stated that you would be fired over this.  Mr. Davis said

---

[38]*Defs' Ex. D*, the Affidavit of Sandra Wood, Director of Health Personnel, includes a March
1993 departmental handbook which is captioned *"Discipline - Due Process and Pre-Disciplinary
Hearings - Grievances and Complaints."* Although it makes references to "general work rules",
"safety rules", and "other rules", none of the offenses attributed to Pettway, Boyd, and Cumbie are
specified in the same language.  There is no provision regarding the nature of offenses which merit
a demotion, but it is described as a "major disciplinary action."[page 1-1]  Notably missing from the
list of 11 infractions which follow the following provision [at page 1-5] is any of the offenses
enumerated specifically for Pettway and the two comparators:

> *"Although progressively severe disciplinary measures are*
> *normally applied under Positive Discipline, cases may arise*
> *involving very serious violations of general work rules which*
> *may warrant and justify suspension or termination on the first*
> *offense.  These include but are not limited to... [ ] "*

Among the listed offenses sufficiently serious for immediate suspension or demotion
are "falsifying official records such as the employment application form, medical
excuse, travel reimbursement request, time card, etc" (no.5) – and "refusal to follow
orders." (no. 7); the former arguably is comparable to the "falsification of records"
offense for which both Boyd and Pettway were cited while the latter appears to
implicate the "failure to follow supervisor's directive" offense attributed to Cumbie.

25

that he asked you, wouldn't it be better to tell the truth? [39]

State Health Officer Williamson's notice to Pettway of recommended discipline includes the same documentation for the "solicitation of false information from nursing home staff" charge.  Though this notice does not indicate a work rule violated by this "solicitation" charge,  its only references to specific work rules and specified sanctions are relevant for this analysis:

> The Alabama Department of Public Health's Employee Handbook that you received, and for which you signed a statement taking responsibility for the contents, states that *failure to perform your job and violation of specific departmental rules are violations that normally result in disciplinary actions of increasing severity.  It also states that falsification of records is a violation that may result in suspension  or discharge on the first offense*, considering work record and length of service.[40]

It does not appear that the "solicitation of false information from nursing home staff" charge against Pettway represents a violation of a specific departmental rule or that the Employee Handbook specified mandatory sanctions or a range of sanctions for such a solicitation.  Arguably, the Department would find offensive and thus warranting disciplinary action an employee's action in soliciting or supplying any kind of "false information", whether the recipient is a departmental superior or an agency regulated by the department. Discipline for both charges appears to fall within a discretionary range not subject to written guidelines.  Boyd's four offenses and Pettway's five offenses are not described in a manner which suggests any significant differences in the nature of the offenses: each falsified records and acted unprofessionally, and while Pettway solicited false information,  Boyd acted inappropriately with "false information to superiors" in some unspecified

---

[39]*Defs.' Ex. 14*, Pettway *Dep.*  Mr. Davis, the nursing home Administrator at Capitol Hill, submitted a "to whom it may concern" letter verifying his reported conversation with Pettway, *Defs.Ex. 15*.

[40]*Defs.'Ex. 17*, Pettway *Dep*. (emphasis added).

manner.   Additionally, Boyd  hindered an investigation and apparently accumulated or reported excessive mileage to a State vehicle.

Given the reported  departmental policy that "employees . .  should demonstrate the highest standard of personal integrity, truthfulness, and honesty to instill public confidence and trust in the Department and its functions"[41], a fact finder might concur with Pettway's assessment of  Boyd's misconduct as  more "egregious" and deserving of greater discipline.    Because the summary judgment  record does not permit a determinative ruling by the court on the comparability of misconduct by  Boyd  and Pettway,  disputed facts which will decide Boyd's status as a similarly situated disciplined employee must be resolved by the jury based on supplemental evidence.

Independent of the similarity between  Boyd's "false information" offense and Pettway's "solicitation of false information", the Department submits evidence which raises instead of resolving the question of the Department's pattern or policy in disciplining employees whose offenses relate to agencies regulated by the Department:

> Prior to the Plaintiff's discipline in 2002, John Story, a Caucasian male employed as the  Director of the  Department's  Emergency  Medical  Services  Division,  was disciplined for: (1) violations of Department rules concerning solicitation of regulated parties and parties with whom the Department does business and (2) violations of Department policies concerning travel.[42]

_____

[41]*Defs.'Ex. 17*, Pettway *Dep*. at 4.

[42]*Defs.' Ex. F*, Pettway *Dep*., Affidavit of Rick Harris at ¶14. As Director of the Bureau of Health Provider Standards, Harris avers that "[i]t is within the authority of [his] job to recommend disciplinary action against Bureau employees who have engaged in workplace misconduct." (¶ 3) Additional testimony by Harris, as follows, makes it material to know the nature of the discipline suffered by  Story for, *inter alia*,  "solicitation of regulated parties and parties with whom the Department does business" in contrast to Pettway's discipline for, *inter alia,* "soliciting false information" from a regulated business:

> "Surveyors are forbidden to solicit any kind of personal favor from
> (continued...)

The nature of the discipline imposed on this employee is not documented anywhere on this record, but it could be pertinent to his status as a similarly situated comparator.

Turning to Wayne Cumbie, the other identified comparator,  the court finds no documentation for the facts underlying his "failure to perform his job properly as a Licensure and Certification Surveyor" sufficient to compare the  same misconduct committed by  Pettway.  Nor does this record permit any comparison of his additional charges – failure to follow supervisor's directive, and violation of the Department's Professional Conduct Policy – with Pettway's arguably similar misconduct.[43]

Another disputed issue which may be material relates to evidence suggesting that the Department did not apply to her its published policy of progressive discipline.[44]  In sum, a dispositive analysis of Pettway's disparate discipline claim must await the jury's resolution of at least the disputed facts on the comparable seriousness of the misconduct which triggered differential discipline to Pettway and the comparators identified for her prima facie case.

---

[42](...continued)
> a nursing home employee, let alone a personal favor that, if granted, would involve a dishonest act.  Surveyors may not be beholden to nursing home staff for any reason – to do so would fatally undermine the integrity of our enforcement process." (¶ 8).

[43]The disciplinary notice to Pettway admonished, in part: "It is the policy of the Alabama Department of Public Health that employees conduct themselves in a professional and unbiased manner in the performance of their duties."  *Defs.Ex*. 17, Pettway *Dep.*

[44]*See Pl.'s Ex.B*, Deposition of Sandra Wood at 69, and the departmental grievance handbook attached to Wood's affidavit (Defs.' Ex.D ), which provides, *inter alia*: "Supervisors must apply the principles of progressive discipline (as described in the Positive Discipline manual) when seeking to bring about changes in employee work habits or in applying disciplinary measures for infractions of established rules and policies." (page 1-1).

### C.    PATTERN AND PRACTICE DISCRIMINATION

Pettway states as follows a purported claim of pattern and practice discrimination:

The Defendant violated Title VII of the Civil Rights Act, Section 1981 and Section 1983 of Title 42 of the United States Code by failing to promote other African Americans employed by the Defendant.  As a proximate result of the pattern and practice alleged therein, the Plaintiff was caused to suffer . . . severe emotional distress and suffering, loss of compensation, financial hardship, pain and suffering, embarrassment and humiliation.[45]

Challenging Pettway's standing to assert this promotional discrimination claim, the Department argues that undisputed evidence establishes the "Assistant" position in controversy to be only a "transfer from one unit to another unit" rather than a promotion.  Even if Pettway has standing, the Department maintains that this claim fails for lack of any evidence for the  essential element of discriminatory intent. Because Pettway's submissions in opposition to summary judgment do not respond at all to these contentions, the Department urges that this claim  be "deemed abandoned and ...dismissed from this action."[46]

Duly reminded  that "summary judgment cannot be granted as a sanction for merely failing to file a response to a motion . . . .", *Trustees of Central Pension Fund v. Wolf Crane Service, Inc*., 374 F. 3d 1035, 1039 (11th Cir. 2004),  this Court will decline the Department's invitation and examine the record to evaluate their claimed entitled to summary judgment on this claim. Allegations of pattern and practice discrimination are presented typically in class actions and   fall within the analytical framework of a  Title VII claim for disparate treatment.

---

[45] *Am.Compl*., *Count Three,*  ¶ 43.

[46] *Defs' Reply (*Doc. 54) at 2.

> To establish a pattern and practice of disparate treatment, the plaintiff must show that intentional discrimination was the employer's standard operating procedure. The plaintiff can prove that discrimination was the standard operating procedure through a combination of statistics and anecdotes.

*Cooper v. Southern Co.*, 390 F. 3d 695, 716 (11th Cir. 2004)(internal quotations and citations omitted);

*see also EEOC v. Joe's Stone Crab*, Inc., 220 F. 3d 1263, 1287 (11th Cir. 2000). In order to satisfy her burden of proof, Pettway " must prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts. [She] has to establish by a preponderance of the evidence that...discrimination [is]...the regular rather than unusual practice." *Cooper*, 390 F. 3d at 724 (internal quotations and citations omitted); *see also Hall v. Ala. Ass'n of Sch. Bds.*, 326 F. 3d at 1171; *Shuford v. Ala. State Bd. of Educ.*, 846 F. Supp. 1511, 1521 (M.D. Ala. 1994).

Guided by these standards of proof, the court readily concludes that the evidentiary record cannot sustain Pettway's discrimination claim based on pattern and practice. There is no statistical evidence at all of pattern and practice discrimination, and Pettway offers no meaningful anecdotal evidence of such discrimination. The only probative reference in the record to any pattern and practice claim is Pettway's identification of several African American employees who have not been promoted; she does not provide, however, any facts necessary to evaluate their applications and non-selection. for promotions.[47] Summary judgment for the Department is thus appropriate on this claim.

---

[47]Pettway *Dep.* at 223, *Defs.' Ex. A* (Doc. 41)

### D.      DISABILITY DISCRIMINATION

Pettway claims disability discrimination prohibited by  Title I of the ADA and Sections 501 and 504 of the Rehab Act[48] for the Department's alleged "fail[ure] to make accommodations for [her] disability", (2)"deni[al] [of a]...promotional opportunity on the basis of her disability", and (3) "suspen[sion] and demot[ion] [of] Plaintiff because of a disability."[49]   Upon analysis pursuant to the applicable standards of proof,  this claim is not buttressed  sufficiently to survive summary judgment.

#### 1.  Legal Standards

Pettway relies on the same operative facts and legal arguments for disability discrimination claims asserted under  the ADA and the Rehab Act, and for analytical purposes, these statutes are nearly identical in substance.  *See Sutton v. Lader*, 185 F. 3d 1203, 1208 n. 5 (11th Cir. 1999); *Pritchard v. Southern Co. Servs.*, 92 F. 3d 1130, 1132 n.2 (11th Cir. 1996); *Edwards v. Ala. Dep't of Corrections*, 81 F. Supp. 2d 1242, 1248-49 (M.D. Ala. 2000).  Thus, the summary judgment analysis on  Pettway's ADA claim will be determinative of  her Rehab Act claim.  *See Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F. 3d 1275, 1280 n. 3 (11th Cir. 2001).

The ADA forbids covered employers from "discriminat[ing] against a qualified individual with

---

[48]Section 501 of the Rehab Act (29 U.S.C.§ 791) provides no separate cause of action for Pettway as it is concerned principally with affirmative action plans relating to individuals with disabilities employed in federal agencies.  Because it is undisputed that the  Department is a state agency which receives federal funds, the Rehab Act analysis for Pettway's discrimination claim is limited to Section 504 (29 U.S.C. § 794) which provides, in pertinent part:  *[n]o otherwise qualified individual with a disability...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program..."*

[49]*Am. Compl.* ¶¶ 37-39.

a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a).  To establish a *prima facie* case of ADA discrimination,  Pettway must show that she (1) had or was perceived to have a "disability"; (2) was a "qualified" individual; and (3) was discriminated against because of her disability.  *Carruthers v. BSA Advertising, Inc.*, 357 F. 3d 1213 (11th Cir. 2004) (citing *Williams v. Motorola, Inc.*, 303 F. 3d 1284 , 1290 (11th Cir. 2002))

### *2.  Evidentiary Analysis*

The Department contends that Pettway's disability discrimination claim fails for her inability to establish as the first prong of a *prima facie* case the *fact* of her disability within the following definition set by the ADA:

> (A)  a  physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B)  a record of such an impairment; or (C) being regarded as having such an impairment." [50]

Thus, the court examines the record first for any genuine issue of disputed material fact on whether Pettway was "disabled" or "regarded as disabled."[51]

Pettway claims a qualifying "mental disability" which "not only affected such major life

---

[50] 42 U.S.C. §12102(2).  This definition of disability in the ADA is identical to the "individual with a disability" definition in the Rehab Act, 29 U.S.C.A. § 705(20)(B)

[51] Defendants also challenge plaintiff's status as a "qualified individual with a disability" – i.e., an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position [as determined by the employer] that such individual holds or desires." 42 U.S.C.A. § 12111(8).  If Pettway cannot establish her disability within the ADA definition, however, she cannot recover for disability discrimination, and this additional contentions need not be examined.  *See Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1216 (11th Cir. 2003).

activities as her ability to concentrate, but . . . her ability to live as it made her prone to suicidal thoughts and acts"; the Department failed to accommodate this disability, Pettway further claims, "when [it] refused [her] request to return to work with a restriction on overnight travel and when [it] attempted to force her back to work without such restrictions."[52]

Pettway's claimed disability prompts a three-step analytical process, established by the United States Supreme Court, to determine whether she has "a physical or mental impairment that substantially limits one or more of [her]major life activities."

> [F]irst, plaintiff[] must be impaired. Next, the court must identify the life activity that the plaintiff claims has been limited and determine whether it is a major life activity under the ADA. The regulations ... define major life activities as 'functions of caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.' If not contained within the exemplars, the activity must be "significant" to everyday life. Finally, the court must determine whether the impairment "substantially limits" that life activity.

*Rossbach v. City of Miami*, 371 F. 3d 1354, 1357 (11th Cir. 2004), *citing, inter alia, Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).

The court finds that Pettway has satisfied the initial requirement of a demonstrated mental impairment. For the second inquiry, Pettway identifies *working* – one of the "major life activities" enumerated in the regulations – as the major life activity which has been limited by her mental impairment [53] Accordingly, the final query is whether Pettway has created a triable issue of fact that

---

[52]*Pl.'s Br.* at 15-17.

[53]*Pl.'s Br.* at 16. Pettway also claims her mental impairment affected "such major life activities as her ability to concentrate...[and] her ability to live as it made her prone to suicidal thoughts and acts." *Pl.'s Br*. at 17. When a plaintiff claims an activity that is not specifically listed in the regulations, the activity must be "significant" to everyday life. *See Rossbach, supra* at 1357. Because Pettway provides evidentiary support and arguments only for the major life activity of working, the Court's analysis is similarly limited.

her mental impairment substantially limited her from working.

Pettway must show that she was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. §1630.2(j)(3)(i).  "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.*  Thus, an impairment must preclude an individual from more than one type of job, even if that job foreclosed is the individual's job of choice.  *Carruthers, supra* at 1216 (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999)).

Pettway has failed to provide sufficient evidence that she was restricted in her ability to perform either a class of jobs[54] or a broad range of jobs in various classes."[55]  Instead, she merely asserts her need for a less stressful job and communications from her doctor restricting her  from overnight travel.[56]  Pettway's conclusory claim of an ADA-covered disability is not supported by any evidence to create a disputed fact with respect to whether her mental impairment rises to the level of a substantial limit on her working.[57]  Nor does she proffer any evidence sufficient to create a dispute

---

[54]A "class of jobs" refers to "the job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographic area, from which the individual is also disqualified because of this impairment. 29 C.F.R. §1630.2(j)(3)(ii)(B).

[55]A "broad range of jobs in various classes" is defined as "the job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. §1630.2(j)(3)(ii)(C).

[56]Ex. 28 and Ex. 32,  Pettway *Dep.*

[57]*See* 29 C.F.R. §1620.2(j ) ( specifying as pertinent the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment).

(continued...)

that the Department regarded her as having a permanent or long-term impairment; testimony suggesting the defendants' awareness of her impairment[58] is insufficient to demonstrate that the Department regarded her as disabled. *See Sutton v. Lader*, 185 F. 3d 1203, 1209 (11th Cir. 1999). Because Pettway has not produced any evidence sufficient to establish an indispensable element of her disability discrimination claim – that she is "disabled" within the statutory definition – summary judgment for the Department is due to be granted.


### E.   RETALIATION DISCRIMINATION

Pettway contends that the Department retaliated against her, in violation of both the ADA and the Rehab Act, "upon learning of her disability by demoting her and treating her less favorably than non-disabled white employees."[59] Notwithstanding Pettway's failure to respond at all in opposition to Defendant's summary judgment motion on this claim, the court proceeds to analyze the summary

---

[57](...continued)
Although Pettway's treating physician recommended some work-related restrictions (*See* Exs. 28 and 32, Pettway Dep), the evidence supports only a temporary duration for her her mental impairment. *See* 29 C.F.R. §1630 App, §1630.2(j) ("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities")

[58]Pettway argues: "[d]efendants were intimately aware of the details of Plaintiff's condition. They received communications from Plaintiff's psychiatrist explaining Plaintiff's condition. Plaintiff also talked with Ms. Pezent several times during the week about her condition. Defendants were also aware of Plaintiff's suicidal thoughts." *Pl.'s Br.* at 17. Pettway testified that she spoke with Pezent through the whole process and that "she knew [she] was still sick."(Pettway *Dep*. at 68-69).

[59]Count Four, ¶ 46. Though Pettway's complaint does not identify the Department as the only defendant for this retaliation claim, as documented at III-A, n.6, *supra,* there is no individual liability for discrimination under the ADA or the Rehab Act and accordingly, none exists for retaliation discrimination under these statutes. *Cf. Shotz v. City of Plantation*, 344 F. 3d 1161, 1173-80 (11th Cir. 2003)( addressing an ADA retaliation claim, the court held that individual liability for ADA retaliation is available in the public services context but declined to decide if such liability exists in the employment context).

judgment submissions after stating the applicable standards.

### 1. Legal Standards

The ADA prohibits discrimination against any individual "because ...such individual has opposed any act or practice made unlawful" by the Act or "because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the Act. 42 U.S.C. §12203. Incorporating by reference this anti-retaliation language, the Rehab Act forbids the same retaliatory conduct. 42 U.S.C. §794; *see also*, *Shotz v. City of Plantation*, 344 F. 3d 1161 (11th Cir. 2003).

Retaliation claims are treated the same – using the Title VII analysis for retaliation discrimination – whether brought under Title VII, the ADA, the Rehab Act, the Age Discrimination in Employment Act, or the Family and Medical Leave Act. *See Brungart v. Bellsouth Telecomm., Inc*., 231 F.3d 791 (11th Cir. 2000); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). Absent direct evidence of the employer's discrimination, the court applies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), requiring the plaintiff to establish for a *prima facie* case of retaliation that: (1)she engaged in statutorily protected expression; (2)she suffered an adverse employment action; and (3) there is a causal connection between the protected expression and the adverse employment action. *See Williams v. Motorola, Inc*., 303 F. 3d 1284, 1291 (11th Cir. 2002); *Farley v. Nationwide Mut. Ins. Co*., 197 F. 3d 1322, 1336 (11th Cir. 1999).

### 2. Evidentiary Analysis

Pettway's retaliation claim requires no extensive analysis as she cannot establish the first prong

of the *prima facie* case – that she engaged in statutorily protected expression.[60]  She does not claim

retaliation arising from either her EEOC Charge of Discrimination, indisputably filed subsequent to

the culpable acts and failures attributed to the defendants, or any pre-Charge expressions of complaints

or grievances communicated directly to the Department.

In order for Pettway's  request for an accommodation restricting overnight travel to  trigger

the anti-retaliatory provisions of the ADA and the Rehab Act, she is bound to demonstrate that she

"had a good faith, objectively reasonable belief that [she] was entitled to those accommodations under

the ADA." *Standard v. A.B.E.L. Servs., Inc*., 161 F. 3d 1318, 1333 (11th Cir. 1998); *see also Kennedy*

*v. Kelly Temporary Servs., Inc*., 95 F. Supp. 2d 1288, 1296 n.6 (M.D. Ala. 2000).  The Eleventh

Circuit explained Pettway's burden in *Little v. United Techs., Carrier Transicold Div*., 103 F. 3d 956,

960 (11th Cir. 1997):

> [I]t is critical to emphasize that a plaintiff's burden under this standard has both a
> subjective and an objective component.  A plaintiff must not only show that she
> subjectively (that is, in good faith) believed that [her] employer was engaged in
> unlawful employment practices, but also that [her] belief was objectively reasonable
> in light of the facts and record presented.

Pettway has not produced any evidence that, at the time of her request to return to work with

restrictions of no overnight travel, her belief that she was disabled was *objectively* reasonable.  As

explained in discussing the merits of Pettway's disability discrimination claim, she failed to provide

sufficient evidence that she was "disabled" as defined under the ADA.  Because Pettway  has not

created any triable issues of fact that she was engaged in a "statutorily protected expression" when she

---

[60]For her retaliation action, Pettway merely restates the factual underpinnings of her
disability discrimination claim: her suspension, transfer and demotion; the Department's failure to
provide her accommodations; and the prohibition of continued  donation of sick leave. *See*
*Am.Compl*. ¶ 46; Pettway *Dep*. at 229-30; *Ex*. 1 to Pettway *Dep*.

requested an accommodation, the Department is entitled to summary judgment on this retaliation claim.

## IV. CONCLUSION

Consistent with the findings and conclusions in this *Memorandum Opinion*, it is **ORDERED** that *Defendants' Motion for Summary Judgment* (Doc. 39, July 7, 2004) is

**DENIED with respect to** *Plaintiff Pettway's Title VII race discrimination claim of disparate discipline against the Defendant Department; and*

**GRANTED on all other claims asserted against all Defendants.**


**A  Partial Summary Judgment is entered herewith.**

Done this 15th  day of July, 2005.


                                        **/s/ Delores R. Boyd**
                                        DELORES R. BOYD
                                        UNITED STATES MAGISTRATE JUDGE